UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

BRENDA DIAZ-ORTEGA,                 CIVIL DOCKET NO. 1:19-CV-670-P
Petitioner

VERSUS                              JUDGE DRELL

GEORGE H. LUND, III, *ET AL.,*      MAGISTRATE JUDGE PEREZ-MONTES
Respondents

---

## REPORT AND RECOMMENDATION

Before the Court are: (1) a Petition for Writ of Habeas Corpus (Doc. 1) filed by counsel for Petitioner Brenda Diaz-Ortega ("Diaz-Ortega"), and; (2) a Motion to Dismiss (Doc. 12) filed by Respondents George H. Lund, III (an Acting Field Office Director in the Department of Homeland Security/Bureau of Immigration and Customs Enforcement ("DHS/ICE")), and D.C. Cole (Warden of the Lasalle Parish Detention Center) (collectively, the "Government").

Diaz-Ortega is an immigration detainee in the custody of DHS/ICE. She is being detained at the LaSalle Detention Facility in Jena, Louisiana. She challenges her detention pending a decision by the Board of Immigration Appeals ("BIA").

Because this is a habeas corpus proceeding, the Government's Motion to Dismiss (Doc. 12) should be DENIED as procedurally improper. In reaching the merits of Diaz-Ortega's Petition, however, the Court properly construes the Motion and the parties' other briefs (Docs. 14, 22, 23) as substantive habeas briefs.

And on its merits, the Petition presents unusual circumstances. For more than 18 months, Diaz-Ortega has remained in "post-removal-order detention" under 8

U.S.C. § 1231.  She moved the BIA to reopen her immigration proceedings and to stay her removal.  The BIA granted the stay nearly 17 months ago, which has prevented her removal – and prolonged her detention – since then.

But the BIA *will* decide Diaz-Ortega's motion to reopen.  If the BIA grants the motion, Diaz-Ortega's removal order will no longer be final.  If the BIA denies the motion, her removal will again become probable, notwithstanding other challenges she may pursue.  In either event, under our jurisprudence, Diaz-Ortega cannot show that there is no significant likelihood of her removal in the reasonably foreseeable future.  Therefore, Diaz-Ortega's Petition (Doc. 1) should be DENIED IN PART and DISMISSED WITHOUT PREJUDICE.

But relief is warranted in one respect.  DHS/ICE has incorrectly determined that Diaz-Ortega is not subject to 8 C.F.R. § 241.4, and has accordingly denied her a custody review and other procedural rights required by that regulation.  Therefore, Diaz-Ortega's Petition (Doc. 1) should be GRANTED IN PART to the extent necessary to secure Diaz-Ortega's access to those procedural rights.

I.  <u>Background</u>

Diaz-Ortega is a native and citizen of Honduras.  She entered the United States on December 12, 2002.  (Doc. 20-9, p. 1).  She was deemed inadmissible, and was issued a Notice to Appear.  (Doc. 20-9, p. 1).  Her request for asylum and her application for withholding of removal were both subsequently denied.  (Doc. 20-11).

Diaz-Ortega was granted permission for voluntary departure, which was to occur on or before January 23, 2004.  (Doc. 20-11).  She appealed to the BIA on

December 29, 2003, but did not voluntarily depart. (Doc. 20-9, p. 1). The BIA denied her appeal, and set a new voluntary departure deadline of May 26, 2005. (Doc. 20-12). Again, Diaz-Ortega did not voluntarily depart. (Doc. 24, p. 27). Instead, she moved the BIA to reconsider its decision on her appeal. (Doc. 20-13). The BIA denied her motion to reconsider on July 21, 2005. (Doc. 20-13).

Nearly three years passed without incident. Then, on July 2, 2008, DHS/ICE issued a "Warrant of Removal/Deportation" for Diaz-Ortega. (Doc. 20-14, p. 1). It is unclear what prompted the warrant to be issued at this particular time.

Nearly four more years passed, however, again without incident. But on June 20, 2012, Diaz-Ortega "was encountered in New Orleans and placed under an Order of Supervision (OSUP) pending removal." (Doc. 20-9, p. 2). Diaz-Ortega was placed under the OSUP – rather than detained or removed – in part because she had minor children at the time. (Tr. 29).

By the terms of the OSUP, because Diaz-Ortega was not removed "during the period prescribed by law," she was "permitted to be at large" subject to various conditions. (Doc. 20-1, p. 1). Included were requirements that Diaz-Ortega: (1) not commit a federal, state, or local offense; (2) "appear in person" at the request of DHS/ICE "for deportation or removal," and meanwhile; (3) report in person to DHS/ICE on scheduled dates. (Doc. 20-1, p. 1). She remained in the United States for the next roughly six years under the terms of the OSUP.

When Diaz-Ortega reported on April 11, 2018, however, DHS/ICE revoked the OSUP and placed her into custody. (Docs. 20-2; 20-9, p. 2). According to the

3

Declaration of Assistant Field Office Director Richard Brooks, DHS/ICE revoked the OSUP because Diaz-Ortega's children reached adulthood, and because she "had frequently missed reporting dates under her OSUP conditions." (Doc. 20-9, p. 2).[1]

On April 19, 2018, Diaz-Ortega's attorney submitted an "Application for Request for Stay of Deportation or Removal" based on a fear of harm if Diaz-Ortega was returned to Honduras. (Doc. 20-3). DHS/ICE denied the request. (Doc. 20-3).

On May 11, 2018, Diaz-Ortega filed a motion to reopen, and a request for stay of removal pending a decision on the motion to reopen. (Doc. 20-4). Six days later, on May 17, 2018, a 30-day travel document was issued for Diaz-Ortega. (Doc. 20-7) . And seven days after that, on May 24, 2018, the BIA granted Diaz-Ortega's request for a stay. (Doc. 20-4). This seven-day period was the only time during which Diaz-Ortega could actually have been removed from the United States. (Tr. 37). However, the travel document expired in 30 days. (Tr. 47). Given the stay, Diaz-Ortega was not removed, and remained in DHS/ICE custody.

On July 11, 2018, DHS/ICE conducted a 90-day review of Diaz-Ortega's case and issued a "Decision to Continue Detention." (Doc. 20-5). This prompted Diaz-

---

[1] The "Personal Report Record" seems to indicate that Diaz-Ortega reported one day late in August 2015, two months late in 2017, and one day late in April 2018. (Doc. 20-1, p. 2). Deportation Officer Joshua Cox ("Officer Cox") testified that, to the best of his understanding of the records, Diaz-Ortega missed one appointment altogether and was late for one other appointment. (Transcript of Evidentiary Hearing ("Tr.") at 33, 44, Doc. 24). In her testimony, Diaz-Ortega explained why she was late on at least one of those occasions. (Tr. 61-62).

The Government offered no evidence that Diaz-Ortega has a criminal history. (Tr. 46, 62-63). Diaz-Ortega testified that she has never been arrested. (Tr. 63).

Ortega's attorney to submit a "Request for Prosecutorial Discretion" seeking her release. (Doc. 12-13, pp. 1-4). That request was denied.

To date, the BIA has not ruled on Diaz-Ortega's May 11, 2018 motion to reopen. To date, the BIA's stay of her removal remains in effect. And to date, she remains in DHS/ICE custody.

In her Petition (Doc. 1), Diaz-Ortega claims that her continued detention is unconstitutional. The Government maintains that Diaz-Ortega's Petition is meritless given the inevitability of a decision by the BIA, and "premature" given the stay of her removal less than 90 days after she was detained. (Doc. 12).

The Court conducted an evidentiary hearing on July 29, 2019.[2] Two witnesses testified – Diaz-Ortega and Officer Cox. (Doc. 24). The Court received documentary exhibits. (Doc. 20). And at the Court's instruction, both parties filed supplemental briefs after the hearing. (Docs. 22, 23).

## II. Law and Analysis

### A. The Court has jurisdiction to grant habeas relief under 28 U.S.C. § 2241.

A district court has the authority to grant a writ of habeas corpus under 28 U.S.C. § 2241(a). A § 2241 petition is the proper method to challenge the legality and constitutionality of extended detention pending removal. Zadvydas v. Davis, 533 U.S. 678, 687-88 (2001). But a petitioner may seek habeas relief under § 2241 only if the petitioner is "in custody" under federal authority or for violation of federal law. 28

---

[2] Counsel for Diaz-Ortega waived his right to file a response to the Government's Motion to Dismiss, electing instead to present evidence and argument at the hearing. (Tr. 6).

U.S.C. § 2241(c). The "in custody" requirement is a jurisdictional prerequisite. Maleng v. Cook, 490 U.S. 488, 490 (1989).

Because Diaz-Ortega has remained in DHS/ICE custody since April 11, 2018, the Court has jurisdiction under § 2241.

**B.      The Court does not have jurisdiction over Diaz-Ortega's removal order.**

"The passage of the REAL ID Act divested district courts of jurisdiction over removal orders and designated the courts of appeals as the sole forums for such challenges via petitions for review." Moreira v. Mukasey, 509 F.3d 709, 712 (5th Cir. 2007); see also 8 U.S.C. § 1252(a)(5), as amended by REAL ID Act § 106(a) ("Notwithstanding any other provision of law . . . a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this Act...."); 8 U.S.C. § 1252(b)(9), as amended by REAL ID Act § 106(a)(2) ("Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision . . . to review such an order or such questions of law or fact."). Moreover, the Fifth Circuit has specifically held that district courts lack jurisdiction to consider requests for a stay of removal proceedings. Idokogi v. Ashcroft, 66 F. App'x 526 (5th Cir. 2003) (per curiam).

Diaz-Ortega does not request review or a judicial stay of her removal order. Nevertheless, the Court notes that, because it lacks jurisdiction, no findings below

should be construed as a substantive review of her removal order or a determination as to whether her removal order should be judicially stayed.

### C.    <u>The Government's Motion to Dismiss is procedurally improper.</u>

The Federal Rules of Civil Procedure "apply to proceedings for habeas corpus . . . to the extent that the practice in those proceedings . . . (A) is not specified in a federal statute, the Rules Governing Section 2254 Cases, or the Rules Governing Section 2255 Cases [collectively, the "Habeas Rules"]; and (B) has previously conformed to the practice in civil actions."  Under Rule 1(b) of the Rules Governing Section 2254 Cases, the Habeas Rules also apply to § 2241 habeas cases. See <u>Romero v. Cole</u>, 1:16-CV-00148, 2016 WL 2893709, at *2 & n.4 (W.D. La. Apr. 13, 2016), report and recommendation adopted, 1:16-CV-00148, 2016 WL 2844013 (W.D. La. May 12, 2016) (and cases cited therein).

The Habeas Rules set forth procedures for responding to and evaluating habeas petitions – not the Federal Rules of Civil Procedure.  <u>See</u> <u>Williams v. Willis</u>, EP-17-CV-184-KC, 2018 WL 852381, at *5 (W.D. Tex. Feb. 13, 2018), aff'd, 765 Fed.Appx. 83 (5th Cir. 2019).  Accordingly, "[a] motion to dismiss for failure to state a claim is an inappropriate practice in habeas." <u>Miramontes v. Driver</u>, 243 Fed.Appx. 855, 856 (5th Cir. 2007) (citing <u>Browder v. Director, Dep't of Corrections of Ill.</u>, 434 U.S. 257, 269 n. 14, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978)); <u>accord</u> <u>Odom v. West</u>, 174 F.3d 198 (5th Cir. 1999).  The Government's Motion to Dismiss (Doc. 12) should therefore be DENIED.

However, the Court may still reach the merits.  Diaz-Ortega filed a Motion for Expedited Hearing.  (Doc. 4).  The Court granted that motion in part, set forth an expedited briefing and hearing schedule, and ordered both parties to file briefs addressing the Petition in general, and several listed issues in particular.  (Doc. 5). The Government filed the Motion to Dismiss (Doc. 12) instead, prompting Diaz-Ortega to file a Response to the Motion to Dismiss (Doc. 14).  And after submitting evidence at the hearing, both parties also filed supplemental briefs.  (Docs. 22, 23).

Thus, ample briefing has occurred, and a complete record has been established. The Court construes the Government's Motion to Dismiss (Doc. 12) and its supplemental brief (Doc. 22) as its response to Diaz-Ortega's Petition (Doc. 1).  The Court also construes Diaz-Ortega's Response to Motion to Dismiss (Doc. 14) and her supplemental brief (Doc. 23) as her briefing in support of the Petition (Doc. 1).  With the briefs so construed, the Court may properly decide the merits of Diaz-Ortega's Petition.  See, e.g., Gillam v. Cain, CV 14-2129, 2016 WL 3078772, at *1 & n.6 (E.D. La. Mar. 17, 2016), report and recommendation adopted, CV 14-2129, 2016 WL 3060254 (E.D. La. May 31, 2016) (construing the Government's motion to dismiss as its response to a habeas petition).

### D.    Diaz-Ortega is in post-removal-order detention under 8 U.S.C. § 1231.

DHS/ICE derives its detention authority from the Immigration and Nationality Act (the "INA"), 8 U.S.C. § 1101 *et seq.*  Two INA provisions may authorize detention under the circumstances presented here — either 8 U.S.C. § 1226 ("Section 1226"), or 8 U.S.C. § 1231 ("Section 1231").

Section 1226 generally "governs the process of arresting and detaining . . . aliens pending their removal." <u>Jennings v. Rodriguez</u>, 138 S.Ct. 830, 837 (2018). Section 1226 states that "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Under Section 1226 – and if not dealing with a "criminal alien" – the Government may either detain an alien or release an alien on bond. <u>Id.</u> § 1226(a)(1)-(2). If detained, an alien would have the right to request a bond hearing, along with other procedural rights. <u>See</u> 8 C.F.R. § 1236.1(d).

Section 1231 generally governs post-removal-order detention, or detention of an alien subject to a "final order of removal." 8 U.S.C. § 1231. Section 1231 provides that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." <u>Id.</u> § 1231(a)(1)(A). Subsection (a)(2) requires detention during this 90-day "removal period." <u>Id.</u> § 1231(a)(2).[3] "If the alien does not leave or is not removed within the removal period," the alien is normally placed on supervised release. <u>Id.</u> § 1231(a)(3). But if an alien is detained past the removal period, the familiar standards set forth by the United States Supreme Court in <u>Zadvydas v. Davis</u> would apply. <u>See</u> 533 U.S. 678, 701; 121 S.Ct. 2491, 2505; 150 L.Ed.2d 653 (2001).

Here, while the parties did not raise the issue, there could be a dispute regarding which section governs Diaz-Ortega's detention. Some circumstances favor

---

[3] As defined by Congress in § 1231(a)(1)(A), the term "removal period" refers only to this 90-day period beginning when one of three "triggering events" listed in § 1231(a)(1)(B) occurs. Importantly, the term does not refer to any subsequent or other period.

Section 1231. When Diaz-Ortega was arrested, she was undoubtedly subject to a final order of removal. On November 24, 2003, an immigration judge ("IJ") ordered her to depart within 60 days. (Doc. 20-11). The BIA denied Diaz-Ortega's appeal of that decision on April 26, 2005, and afforded her 30 more days to depart voluntarily. (Doc. 20-12). When she did not depart by May 26, 2005, the IJ's order was converted to a final order of removal. Meanwhile, Diaz-Ortega filed a motion to reconsider. (Doc. 20-13). The BIA denied her motion to reconsider on July 21, 2005, making her removal order final. (Doc. 20-13). Thus, when Diaz-Ortega was arrested on April 11, 2018, she had been subject to a final removal order for nearly 13 years.

But for almost six of those 13 years, she reported to DHS/ICE under the OSUP. (Doc. 20-1, p. 1). She was not removed during the removal period. She was not detained until April 11, 2018. Even after that, the BIA stayed her removal, meaning that, since May 24, 2018, she has not been removable.[4] And depending upon the BIA's decision, she may or may not be removable again. These circumstances suggest that Section 1226 should apply.

In similar cases, some courts have applied Section 1226. In <u>Hechavarria v. Sessions</u>, 891 F.3d 49, 53 (2d Cir. 2018), as amended (May 22, 2018), for example, the United States Court of Appeals for the Second Circuit stayed a "criminal alien's" removal, and applied Section 1226 to the alien's detention, pending its decision on the alien's appeal. The Second Circuit held that, "when a stay has been issued, an immigrant is not held pursuant to Section 1231(a) because he is not in the 'removal

---

[4] Both parties agree that the stay precludes Diaz-Ortega's removal. (Tr. 8, 11, 38).

period' contemplated by statute until his appeal is resolved by this Court." Id. at 51. According to Hechavarria, Section 1231 "assumes that the immigrant's removal is both imminent and certain," and thus applies where "no substantive impediments remain to the immigrant's removal." Id. at 55; see also Guerra v. Shanahan, 831 F.3d 59, 62–63 (2d Cir. 2016) (applying Section 1226 to an otherwise removable alien detained during "withholding-only proceedings," because "§ 1226(a) authorizes the detention of aliens whose removal proceedings are ongoing," while, "[b]y contrast, . . . § 1231(a) is concerned mainly with defining the 90-day removal period during which the Attorney General 'shall remove the alien'").

The United States Court of Appeals for the Fifth Circuit has not squarely addressed the issue.  Nevertheless, Hechavarria would not apply here.  Critically, a court did not stay Diaz-Ortega's removal.  Accordingly, this case does not implicate 8 U.S.C. § 1231(a)(1)(B)(ii), which lists the triggering events – including a judicial stay – upon which Hechavarria relied in its reasoning.  Hechavarria, 891 F.3d at 54-55; see also Wilson v. Mukasey, CIV. A. 2:08-1646, 2010 WL 456777, at *8 (W.D. La. Feb. 2, 2010) (explaining that a "petitioner's detention continued to be governed under § 1226" pending a judicial stay of removal under § 1231(a)(1)(B)(ii)).

Even so, the Fifth Circuit's related decisions are not easily reconciled with Hechavarria.  The Fifth Circuit has been clear that, absent a judicial stay, an administratively final order of removal "shifts" the Government's detention authority from Section 1226 to Section 1231.  See Ariwodo v. Gonzales, 245 Fed.Appx. 403, 407–08 (5th Cir. 2007); see also Oyelude v. Chertoff, 170 Fed.Appx. 366, 368 (5th Cir.

2006) ("Oyelude's challenge to his § 1226 detention was mooted . . . when his final removal order was entered and the Attorney General's authority to detain him shifted to § 1231.").[5]  Nothing in the Fifth Circuit's decisions would clearly indicate that detention authority "shifts back" to Section 1226 when the BIA stays removal.

But in at least one case, both this Court and the Fifth Circuit, at least by implication, held to the contrary.  In Adefemi v. Gonzales, 05-CV-1861, 2006 WL 2052120 (W.D. La. Mar. 7, 2006), subsequently aff'd, 228 F. App'x 415 (5th Cir. 2007), the petitioner—like Diaz-Ortega—sought to reopen removal proceedings, and was granted a stay pending the BIA's decision.  Section 1226 was not mentioned.  But the Court indicated that the petitioner was still subject to a final order of removal while the motion to reopen and stay were pending before the BIA.  Id., 2006 WL 2052120 at *1.  The Fifth Circuit affirmed this decision, but again, did not discuss Section 1226.  See Adefemi v. Gonzales, 228 Fed.Appx. 415, 417 (5th Cir. 2007).

And as described in more detail below, a contrary interpretation of Section 1231 would nullify a regulation that, by its express terms, applies in this situation.  Under that regulation, "an alien who has filed a motion to reopen immigration proceedings for consideration of relief from removal . . . shall remain subject to the provisions of [this regulation interpreting Section 1231] unless the motion to reopen

---

[5] Likewise, this Court has described a final removal order as the mechanism that shifts DHS/ICE's detention authority: "Section 1226 is titled 'Apprehension and detention of aliens' and precedes the sections governing the removal proceedings (§§ 1228-1229a), indicating that it applies to pre-removal order detention. Section 1231 is titled 'Detention and removal of aliens ordered removed' and follows the sections governing removal proceedings, indicating that it applies to post-removal order detention." Barrera-Romero v. Cole, 1:16-CV-00148, 2016 WL 7041710, *3 (W.D. La. Aug. 19, 2016), report and recommendation adopted, 1:16-CV-00148, 2016 WL 7041614 (W.D. La. Dec. 1, 2016).

is granted." 8 C.F.R. § 241.4(b)(1). The regulation even contrasts situations involving "pending immigration proceedings," to which Section 1226 would apply.

Thus, the weight of relevant authority indicates that Diaz-Ortega's detention is governed by Section 1231.

### E.    Diaz-Ortega is not entitled to habeas relief under Zadvydas.

Diaz-Ortega argues that her detention is unconstitutional under Zadvydas, given its "indefinite" length and the "unforeseeable" path ahead. The Government counters that Diaz-Ortega's Petition is "premature." This argument raises three separate issues.

First, in the Government's view, Diaz-Ortega's 90-day removal period has not expired. The Government thereby argues that Diaz-Ortega's removal period began, or "restarted," when she was detained on April 11, 2018. Second, the Government argues that, under Zadvydas, Diaz-Ortega cannot show there is no significant likelihood of her removal in the reasonably foreseeable future. Third, the Government maintains that her removal period, or the permissible period of subsequent detention, was "tolled" because of her filings and the resulting stay.

The Court reaches only the first two issues.

### 1.    Diaz-Ortega's removal period expired, meaning her Petition is not "premature" under 8 U.S.C. § 1231(a)(1)(A)-(B).

DHS/ICE is required to execute a removal order during the 90-day removal period. 8 U.S.C. § 1231(a)(1)(A). Section 1231 expressly lists the three events that trigger the removal period:

(B) Beginning of period

13

The removal period begins on the latest of the following:

(i) The date the order of removal becomes administratively final.

(ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

(iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

Id. § 1231(a)(1)(B).  To correctly identify a removal period, then, a court must determine which of these "triggering events" occurred latest in a given case.  See Andrade v. Gonzales, 459 F.3d 538, 543 (5th Cir. 2006).

In this case, only the first triggering event could apply.  Diaz-Ortega's removal order was never reviewed by any court.  And before April 11, 2018, Diaz-Ortega was never detained in any jurisdiction.  Thus, Diaz-Ortega's removal period began when her order of removal became administratively final.

As noted above, that occurred long ago – specifically, on July 21, 2005, when the BIA denied Diaz-Ortega's motion to reconsider its decision to uphold the IJ's removal order.  See 8 U.S.C. § 1101(47)(B) (an order of removal "shall become final upon the earlier of—(i) a determination by the Board of Immigration Appeals affirming such order; or (ii) the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals"); see also Agyei-Kodie v. Holder, 418 Fed.Appx. 317, 318 (5th Cir. 2011) ("The removal order became administratively final on October 8, 2010, when the Board of Immigration Appeals dismissed the appeal of the immigration judge's decision."); Francis v. Holder, CIV.A. 14-0168, 2014 WL 4207593, at *3 (W.D. La. Aug. 25, 2014) ("Francis's removal order

became final on January 31, 2014, when the Board of Immigration Appeals dismissed his appeal."). And because Diaz-Ortega's 90-day removal period began on July 21, 2005, it expired on October 19, 2005.

DHS/ICE arrested Diaz-Ortega 12 years, five months, and 23 days later. To account for that delay in its "prematurity" argument, the Government must believe that Diaz-Ortega's 90-day removal period "restarted" when she was arrested. The Court has found no opinion of the Fifth Circuit or another district court in our circuit that directly addresses the Government's position. And other courts have not reached a clear consensus.[6] In fact, the jurisprudence seems to contain three identifiable approaches – two in direct conflict with one another, and a third which relies upon a critical factor that is not present in this case.

Under the first approach – for ease of reference, referred to herein as the "restarting approach" – courts have approved restarting an expired removal period every time an alien is detained: "Although the language of § 1231 does not directly address this question, courts that have done so have agreed that, at least with respect to the mandatory 90–day removal period required by § 1231(a) (1)(A), the clock restarts each time an alien subject to a final order of removal is again detained by ICE." Leybinsky v. U.S. Immigration & Customs Enf't, 10 CIV. 5137 RA, 2013 WL

---

[6] Courts *do* broadly agree that "the six-month period [under Zadvydas] does not reset when the government detains an alien under 8 U.S.C. § 1231(a), releases him from detention, and then re-detains him again." Sied v. Nielsen, 17-CV-06785-LB, 2018 WL 1876907, at *6 (N.D. Cal. Apr. 19, 2018), appeal dismissed, 18-16128, 2018 WL 6624692 (9th Cir. Sept. 14, 2018) (collecting cases); Farah v. I.N.S., CIV. 02-4725(DSD/RLE), 2003 WL 221809, at *5 (D. Minn. Jan. 29, 2003) (holding that the revocation of an alien's release would, if anything, "merely restart the 90–day removal period, not necessarily the presumptively reasonable six-month detention period under Zadvydas").

132544, at *9 (S.D.N.Y. Jan. 8, 2013), vacated on other grounds, 553 Fed.Appx. 108 (2d Cir. 2014) (collecting cases).

Under the second approach – referred to herein as the "expiration approach" – courts have declined to restart an expired removal period. One such court recently concluded that, as to the many aliens "ordered removed years ago" but not yet detained or removed, "the 90-day period removal period has likely come and gone based on the date [an] order of removal became administratively final." Hamama v. Adducci, 17-CV-11910, 2019 WL 2118784, at *2 (E.D. Mich. May 15, 2019).

Under the third approach – referred to herein as the "triggering event approach" – courts have held that the removal period restarts only when a distinct circumstance exists: the recurrence of a triggering event listed in § 1231(a)(1)(B). See, e.g., K.A. v. Green, CV 17-3542 (JLL), 2018 WL 1087503, at *3 (D.N.J. Feb. 27, 2018), appeal dismissed sub nom. K.A. v. Warden Essex Cty. Correction, 18-1546, 2018 WL 4372083 (3d Cir. Apr. 25, 2018). For instance, one court stated that "the *only* rational reading of the statute" is to "to allow the removal period to restart after [a judicial] stay was vacated." Michel v. I.N.S., 119 F. Supp. 2d 485, 498 (M.D. Pa. 2000); accord Kudishev v. Aviles, CV 15-2545 (MCA), 2015 WL 8681042, at *3 (D.N.J. Dec. 10, 2015) ("[T]he removal period can be restarted multiple times by various superseding events, such as a new stay order or a detention on criminal charges.") (internal citation and quotation omitted).

Here, the Government's position is based only upon Diaz-Ortega's detention. No triggering event has recurred. The third approach is thus inapposite, and one of

16

the two remaining approaches must apply. The text of § 1231(a)(1)(B) does not provide a definitive answer. And there is a rational basis for disagreement. But given several considerations, the Court adopts the expiration approach.

To start, the text of § 1231(a)(1)(B) does not mention restarting the removal period. Nor does any interpretive regulation of which the Court is aware. See Hamama, 2019 WL 2118784, at *2; see also Bailey v. Lynch, CV 16-2600 (JLL), 2016 WL 5791407, at *2 (D.N.J. Oct. 3, 2016) ("The removal period does not restart simply because an alien who has previously been released is taken back into custody."). Of course, this textual silence is not just persuasive – it has interpretive meaning. The matter is not covered by the text adopted by Congress. Sound interpretive principles would counsel against injecting a provision into the text, particularly where, as here, the injected provision may alter the result.

Further, a plain reading of the *existing* text disfavors the restarting approach. Section 1231 references "[t]he" removal period, a single period triggered exclusively by the latest of three possible events. No other contingencies are provided. Absent a later triggering event – which would, by definition, begin "the" removal period – § 1231(a)(1)(B) dictates that the removal period necessarily begins when a removal order becomes final, and necessarily ends 90 days later.

Once again, the Court chooses the approach that gives effect to a regulation. Under 8 C.F.R. § 1241.1(e), pertaining to *in absentia* removal orders, "[a]n order of removal made by the immigration judge . . . shall become final . . . [i]f an immigration judge orders an alien removed in the alien's absence, immediately upon entry of such

17

order." Thus, an *in abstentia* removal order becomes administratively final – and the removal period begins – as soon as an IJ enters the order. See Olivera-Julio v. Asher, C14-1312-RSM, 2014 WL 6387351, at *2 (W.D. Wash. Nov. 14, 2014). To begin the removal period because of an alien's *absence* under 8 C.F.R. § 1241.1(e), but also because of an alien's *presence* under the restarting approach, would be incongruent.

The expiration approach avoids other conflicts as well. For instance, it eliminates the untenable possibility of detaining an alien for countless "conditional removal periods," each of less than 90 days, and then restarting countless "new removal periods" when the alien is detained again, all without any triggering event. It also comports with the settled "in custody requirement":

> In order to satisfy the "in custody" requirement and obtain habeas relief, a petitioner need not be physically detained. Rosales v. Bureau of Immigration & Customs Enforcement, 426 F.3d 733, 735 (5th Cir. 2005), cert. denied, 546 U.S. 1106 (2006) (citing Rumsfeld v. Padilla, 542 U.S. 426 (2004); Jones v. Cunningham, 371 U.S. 236, 239-40 (1963)). Rather, "other restraints on . . . liberty . . . not shared by the public generally" may constitute custody for habeas purposes. Cunningham, 371 U.S. at 240. In fact, the Fifth Circuit has joined other Circuits in determining that the issuance of a final deportation order against an alien subjects him to a restraint on liberty sufficient to place him "in custody." Rosales, 426 F.3d at 735 (citing cases).

Zamora-Garcia v. Moore, CV M-09-73, 2010 WL 11545009, at *3 (S.D. Tex. Aug. 23, 2010). To afford "in custody" status for habeas purposes, but to deny similar status for removal period purposes, would again be incongruent.

And critically, the expiration approach better conforms to the statutory text. In adopting the restarting approach, other courts have looked elsewhere for support:

> The purpose of the 90–day period is to afford the government a reasonable amount of time within which to make the travel, consular,

> and various other administrative arrangements that are necessary to secure removal. Using a single 90–day clock prior to and following a lengthy period of obstruction would, in many cases, frustrate that purpose by substantially truncating the amount of time within which the removal arrangements must be made.

Diouf v. Mukasey, 542 F.3d 1222, 1231 (9th Cir. 2008). But this rationale risks elevating an ostensible purpose of the statute above its plain meaning.

Section 1231 requires DHS/ICE to execute final orders of removal within 90 days, if possible. It then sets forth the rules to be applied when that does not occur. And it specifically accounts for delays caused by removable aliens themselves – including a "lengthy period of obstruction." The removal period undoubtedly *functions* to afford DHS/ICE time to effect removals. But its stated *purpose* is to create an obligatory timeframe for removal, not a discretionary grace period for detention. Another court has made the same observation:

> In enacting IIRIRA, Congress intended for inadmissible, excludable, or removable aliens to be deported within 90 days, if possible. This is evidenced not only by the clear language of the statute, but also by the change in statutory language in 1996. Section 305 of IIRIRA replaced former 8 U.S.C. § 1252(c) with new 8 U.S.C. § 1231. This change reduced the amount of time that the Attorney General has to deport an alien from six months to 90 days, but extended the removal period if the alien does not cooperate.

Ulysse v. Dep't of Homeland Sec., 291 F.Supp.2d 1318, 1325–26 (M.D. Fla. 2003).

For all of these reasons, the Court adopts the expiration approach.[7] Diaz-Ortega's removal period expired on October 19, 2005, and did not restart when she was arrested on April 11, 2018.

---

[7] This decision does not conflict with the triggering event approach. "The obvious reason" to restart the removal period after the recurrence of a triggering event – as opposed to an alien's detention – "is that INS's authority to effect the removal is suspended due to the occurrence

2. <u>**Diaz-Ortega is not entitled to habeas relief under Zadvydas because she cannot establish that her removal is not reasonably foreseeable.**</u>

Although Diaz-Ortega's removal period expired, her detention may still be lawful. To that end, DHS/ICE could rely upon two provisions of Section 1231: (1) § 1231(a)(1)(C), which extends the removal period; and (2) § 1231(a)(6), which authorizes detention beyond the removal period.

a. <u>**Section 1231(a)(1)(C) does not apply because the removal period expired.**</u>

Under § 1231(a)(1)(C), "[t]he removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal."[8]  An alien is not entitled to habeas

---

of the later event (such as a stay order)." <u>Michel</u>, 119 F. Supp. 2d at 498. In other words, a triggering event affects the Government's *statutory authority* to remove; an alien's detention affects the Government's *practical ability* to remove.

[8] Yet again, courts diverge in applying this INA provision. Some courts have found that, by legally challenging a removal order, an alien "acts to prevent" – and thereby tolls – the removal period, regardless of whether the alien acted in bad faith. <u>See, e.g.</u>, <u>Guan Zhao Lin v. Holder</u>, 10 CIV. 4316, 2010 WL 2836144, at *3 (S.D.N.Y. July 2, 2010) ("The overwhelming weight of authority applying section 1231(a)(1)(C) indicates that the removal period is subject to tolling where the alien acts to prevent his or her removal through judicial action . . . .") (internal citation and quotation omitted); <u>Deacon v. Shanahan</u>, 415CV00407CLSHGD, 2016 WL 1688577, at *5 (N.D. Ala. Apr. 1, 2016), report and recommendation adopted, 415CV00407CLSHGD, 2016 WL 1639899 (N.D. Ala. Apr. 25, 2016) ("[B]ecause petitioner is challenging the removal order, . . . he is acting to prevent his removal; this is another reason that the presumptive removal period has not yet begun to run.") (citing <u>Akinwale v. Ashcroft</u>, 287 F.3d 1050, 1052 n.4 (11th Cir. 2002)).

Other courts have declined to toll the removal period where an alien lawfully challenges, and thus delays, removal. <u>See, e.g.</u>, <u>Sokpa-Anku v. Paget</u>, 017CV01107DWFKMM, 2018 WL 3130681, at *5 (D. Minn. June 8, 2018), report and recommendation adopted, CV 17-1107

relief under <u>Zadvydas</u> before the removal period has expired.  <u>See</u> <u>Kirabira v. Mukasey</u>, 3:08-CV-0921-M, 2008 WL 4945642, at *2 (N.D. Tex. Nov. 18, 2008) ("[I]n a case under § 1231(a)(1)(C), the removal period has not yet expired, and the issue of indefinite post-removal detention under <u>Zadvydas</u> is not before the court.").

But as already decided, Diaz-Ortega's removal period *did* expire.  Thus, § 1231(a)(1)(C) does not apply.  <u>Contra</u> <u>Kirabira v. Mukasey</u>, 3:08-CV-0921-M, 2008 WL 4945642, at *2 (N.D. Tex. Nov. 18, 2008) ("[I]n a case under § 1231(a)(1)(C), the removal period has not yet expired, and the issue of indefinite post-removal detention under <u>Zadvydas</u> is not before the court.").

### b. <u>Section 1231(a)(6) applies, and Diaz-Ortega cannot establish that she is entitled to relief under Zadvydas.</u>

Section 1231(a)(6) provides that "[a]n alien ordered removed who is inadmissible under section 1182 . . . may be detained beyond the removal period."  It

---

(DWF/KMM), 2018 WL 3129002 (D. Minn. June 26, 2018) ("[T]he Court has identified no support for the proposition that a removable person's attempts to challenge a final order of removal, even if wholly meritless, amount to actions taken "to prevent [his] removal . . . .").

In our circuit, it seems settled that an alien's "obstructive acts" would extend the removal period § 1231(a)(1)(C).  <u>See</u> <u>Hook v. Lynch</u>, 639 Fed.Appx. 229, 230 (5th Cir. 2016) ("Despite Hook's protestations to the contrary, the record establishes that he has "fail [ed] or refuse[d] to make timely application in good faith for travel or other documents necessary to [his] departure," thus warranting the extending of the generally applicable 90–day removal period.");  <u>Francis v. Holder</u>, CIV.A. 14-0168, 2014 WL 4207593, at *4 (W.D. La. Aug. 25, 2014) ("[I]f an alien acts to thwart DHS/ICE's efforts to remove him, then the removal period is suspended or tolled during such time.").  Even without a specific finding of obstructive acts or bad faith, the Fifth Circuit has also held that a petitioner's "repeated filings with the BIA constituted acts to prevent his removal, thus extending his removal period under 8 U.S.C. § 1231(a)(1)(C)."  <u>Roach v. Holder</u>, 344 Fed.Appx. 945, 947 (5th Cir. 2009).

As noted below, there is no evidence that Diaz-Ortega has acted in bad faith.  Bu because § 1231(a)(1)(C) is not implicated here, the Court reaches no conclusion about how this jurisprudence may apply to Diaz-Ortega's circumstances.

often applies "when an alien who has been ordered removed is not in fact removed during the 90–day statutory 'removal period.'" See also Demore v. Kim, 538 U.S. 510, 527; 123 S.Ct. 1708, 1719; 155 L.Ed.2d 724 (2003).

Section 1231(a)(6) authorizes detention for a timeframe "reasonably necessary to bring about that alien's removal from the United States." Zadvydas, 533 U.S. at 689. Applying this standard, "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." Id. at 701. Section 1231(a)(6) does not authorize "indefinite detention," however. Tran v. Mukasey, 515 F.3d 478, 484 (5th Cir .2008). Rather, under Zadvydas and § 1231(a)(6), the presumptively permissible timeframe for post-removal-period detention is six months. Id.

"[T]he Supreme Court and the Fifth Circuit have both found that the presumptively reasonable six-month removal period includes the statutory 90-day removal period." Galtogbah v. Sessions, 6:18-CV-00880, 2019 WL 3766280, at *1 (W.D. La. June 18, 2019), report and recommendation adopted, 6:18-CV-00880, 2019 WL 3761637 (W.D. La. Aug. 8, 2019). The Fifth Circuit has also clarified that Zadvydas "creates no specific limits on detention," that six months of detention does not warrant automatic release, and that "[t]he alien bears the initial burden of proof in showing that no . . . likelihood of removal exists." Andrade, 459 F.3d at 543.

In this case, Diaz-Ortega was deemed "inadmissible" (Doc. 20-14) as "[a]n alien present in the United States without being admitted or paroled, or who arrive[d] in the United States at any time or place other than as designated by the Attorney

General."  8 U.S.C. § 1182(a)(6)(A)(i).  As a result, Section 1231(a)(6) and <u>Zadvydas</u> govern Diaz-Ortega's detention.

To obtain relief, Diaz-Ortega must show that there is no significant likelihood that she will be removed in the reasonably foreseeable future.  And she must do so given her unusual circumstances, including the following: (1) her removal was probable before she filed the motion to reopen and request for stay; (2) her removal is now precluded, but only by the BIA's temporary stay and delayed decision; and (3) her BIA proceedings, though now delayed for an inarguably substantial time, will come to an eventual end that likely determines whether she is removed or not.  Under these circumstances, relevant jurisprudence indicates that Diaz-Ortega is not entitled to habeas relief under <u>Zadvydas</u> – at least not at present.

In contrast with this case, <u>Zadvydas</u> "concerned civil confinement that was 'not limited, but potentially permanent.'"  <u>Andrade</u>, 459 F.3d at 543 (quoting <u>Zadvydas</u>, 533 U.S. at 691).  Specifically, the petitioner in <u>Zadvydas</u> filed a habeas claim only after "the Government had thrice failed to secure the transfer of an alien subject to a final order of removal, and could offer no promise of future success."  <u>Andrade</u>, 459 F.3d at 543 (citing <u>Zadvydas</u>, 533 U.S. at 691).

Against that backdrop, the Fifth Circuit has distinguished the <u>Zadvydas</u> petitioner from a removable petitioner detained for more than three years.  <u>Id.</u>  For much of that time, the petitioner pursued challenges to his removal in court.  <u>See id.</u> Although his challenges were unsuccessful, the Fifth Circuit made no findings indicating that the petitioner was obstructing his removal or acting in bad faith.  <u>See</u>

id.  Rather, the Fifth Circuit simply determined that the request for habeas relief was "meritless" under Zadvydas because the petitioner "offered nothing beyond his conclusory statements suggesting that he will not be immediately removed . . . following the resolution of his appeals."  Id. at 543-44.

Based upon Zadvydas and subsequent cases like Andrade, courts in our circuit have denied habeas relief to petitioners in circumstances similar to Diaz-Ortega's. Most recently, a court denied habeas relief where removal was delayed by an alien's application for withholding of removal.  See Hernandez-Esquivel v. Castro, 5-17-CV-0564-RBF, 2018 WL 3097029, at *5 (W.D. Tex. June 22, 2018).  The court made alternative findings under both Zadvydas and the "tolling" doctrine.  As to Zadvydas, the court stated that:

> [t]o meet his burden . . ., Hernandez–Esquivel must allege facts that, if proven true, are capable of showing there is no significant likelihood of his removal in the reasonably foreseeable future. Respondents aptly sum up the reason Hernandez–Esquivel's claims, as currently alleged, fall short: there is no dispute "that [Hernandez–Esquivel's] removal to Mexico has been delayed solely because of his application for withholding of removal."

Id.  The court stressed that, "but-for those collateral proceedings, [the petitioner] would be removed to Mexico forthwith."  Id., 2018 WL 3097029, at *1.[9]

Most comparably, in Adefemi v. Gonzales, this Court dismissed a habeas petition where the Government had already obtained travel documents for the

---

[9] The Court also held, alternatively, that the period of presumptively reasonable detention was tolled because the petitioner's litigation was the sole reason for the delay of removal, and ultimately granted the Government's motion to dismiss under Fed. R. Civ. P. 12(b)(6).  See Hernandez-Esquivel, 2018 WL 3097029, at *7, 12.  Although this Court does neither, the Zadvydas analysis in Hernandez-Esquivel remains helpful here.

petitioner. CIV.A. 05-1861, 2006 WL 2052120, at *2 (W.D. La. Mar. 7, 2006), subsequently aff'd, 228 Fed.Appx. 415 (5th Cir. 2007). Before the petitioner was removed, however, the BIA granted his request to stay pending a ruling on his motion to reopen by the BIA. Id., 2006 WL 2052120 at *2. The Court found that,

> while the presumptively reasonable six-month detention period has indeed expired, Adefemi has not been removed because he filed a motion on January 5, 2006, to reopen his case. On January 24, 2006, shortly after filing his motion, Adefemi received a stay of removal "pending decision on the motion and the adjudication of any properly filed administrative appeal." 8 C.F.R. § 1003.23(b)(iii)(2)(C). Should the Immigration Court reopen Adefemi's immigration case, the order of removal issued against him would no longer be final and the presumptive six-month period under Zadvydas would not apply. If the Immigration Court denies Adefemi's request to reopen his proceedings, Adefemi's removal will become reasonably foreseeable because it was imminent on January 25, 2006, when the Consulate General of Nigeria issued a travel document for Adefemi's return to Nigeria, and there is no reason to believe that a new travel document could not be obtained within a reasonable period after the stay is lifted.

Id.

Most significantly, the Court has been consistent in distinguishing cases like this one from Zadvydas. For example, the Court has constrained its review to underlying events clarifying the likelihood of future removal. See, e.g., Galtogbah v. Sessions, 6:18-CV-00880, 2019 WL 3766280, at *2 (W.D. La. June 18, 2019), report and recommendation adopted, 6:18-CV-00880, 2019 WL 3761637 (W.D. La. Aug. 8, 2019) ("[T]he fact that he was approved for a charter flight to Liberia in November 2018, in conjunction with the telephonic interviews with the Liberian Consulate in February 2019, support a finding that he has failed to meet his burden of proving that there is no significant likelihood of his removal in the reasonably foreseeable

future.").[10]   The Court has also declined to grant <u>Zadvydas</u> relief based upon the mere passage of time, or upon bare conjecture about the future.  <u>See, e.g.</u>, <u>id.</u>, 2019 WL 3766280, at *2.   And the Court has distinguished detentions with an "obvious termination point" from detentions that are "potentially permanent" – meaning untethered to a future decision or event.  <u>See, e.g.</u>, <u>Wilson</u>, 2010 WL 456777, at *10 (citing <u>Demore v. Kim</u>, 538 U.S. 510, 531; 123 S.Ct. 1708, 1721–22; 155 L.Ed.2d 724 (2003)).[11]

Nothing decisive sets this case apart.   Like Diaz-Ortega, the petitioners in cases like <u>Andrade</u>, <u>Galtogbah</u>, and <u>Adefemi</u> challenged removal orders through appropriate legal mechanisms.   And it is axiomatic that they were entitled to do so:

---

[10] <u>See also</u> <u>Emojevwe v. Holder</u>, 09-CV-1672, 2010 WL 5663013, at *4 (W.D. La. Dec. 6, 2010), report and recommendation adopted, CIV.A. 09-1672, 2011 WL 308986 (W.D. La. Jan. 28, 2011) ("Finally, now that the stay of removal has been lifted, there is nothing to suggest that there is no significant likelihood of removing petitioner in the foreseeable future. The government has presented evidence that Nigeria has granted two travel permits for petitioner to return. Petitioner has presented no evidence that once he completes his litigation he will not be removed."); <u>Wilson v. Mukasey</u>, CIV. A. 2:08-1646, 2010 WL 456777, at *10 (W.D. La. Feb. 2, 2010) ("[T]here is no impediment to the deportation or removal of Jamaican citizens' like petitioner. Thus, it does not appear that actual deportation is not reasonably foreseeable, . . . but rather that petitioner's actual, final deportation will be effected as soon as the Fifth Circuit rules on petitioner's pending properly filed Petition for Review.").

[11] In most meaningful respects, this Court's decisions cohere with decisions of the Supreme Court and other circuit and trial courts as well.  <u>See, e.g.</u>, <u>Kim</u>, 538 U.S. at 531 (holding that a reasonable, definite period of "[d]etention during removal proceedings is a constitutionally permissible part of that process"); <u>Castellanos v. Holder</u>, 337 Fed.Appx. 263, 268 (3d Cir. 2009) ("While Castellanos' detention lacks a certain end date, the end is still reasonably foreseeable—the completion of removal proceedings."); <u>Prieto-Romero v. Clark</u>, 534 F.3d 1053, 1065 (9th Cir. 2008) ("Prieto–Romero foreseeably remains *capable* of being removed— even if it has not yet finally been determined that he *should* be removed—and so the government retains an interest in assuring [his] presence at removal.") (internal quotation omitted) (emphasis in original); <u>Ricketts v. Mule</u>, 07-CV-0138(SR), 2009 WL 102953, at *6 (W.D.N.Y. Jan. 13, 2009) (concluding that a petitioner was not entitled to <u>Zadvydas</u> relief in part because "Respondent has submitted sufficient evidence to establish that it is likely that petitioner can be removed to Jamaica once his identity is established").

"All aliens within the United States, 'whether their presence here is lawful, unlawful, temporary, or permanent,' are entitled to procedural fairness." Ali v. Mukasey, 529 F.3d 478, 490 (2d Cir. 2008) (quoting Zadvydas, 533 U.S. at 693). There is also no evidence Diaz-Ortega acted obstructively or in bad faith. Again, the same was largely true of the petitioners Andrade, Galtogbah, and Adefemi.

But the narrow question before the Court is whether Diaz-Ortega can establish that there is no significant likelihood of her removal in the reasonably foreseeable future. Like the petitioners in similar cases before her, she cannot.

Diaz-Ortega's removal is not *certain*. In fact, Diaz-Ortega *cannot* be removed at present. And depending upon the BIA's decision, she may *never* be removed. To further compound the issue, Diaz-Ortega may pursue other available remedies, which could result in even more delays to come.

But none of that necessarily makes Diaz-Ortega's detention indefinite, unreasonable, or otherwise impermissible under Zadvydas. In all probability, only two potential paths await her. On the first, "[s]hould the [BIA] reopen [Diaz-Ortega's] immigration case, the order of removal issued against [her] would no longer be final and the presumptive six-month period under Zadvydas would not apply." Adefemi, 2006 WL 2052120, at *2. And on the second, "[i]f the Immigration Court denies [Diaz-Ortega's] request to reopen [her] proceedings, [her] removal will become reasonably foreseeable because it was imminent on [May 17, 2018], when [Honduras] issued a travel document for [Diaz-Ortega's] return to [Honduras], and [because] there is no

reason to believe that a new travel document could not be obtained within a reasonable period after the stay is lifted." Id.

On either path, Diaz-Ortega cannot foreclose a significant likelihood of her removal in the reasonably foreseeable future.[12]  Honduras already issued a travel document for Diaz-Ortega (Doc. 20-7), although it has now expired (Tr. 47).  Officer Cox testified that DHS/ICE generally has no difficulty obtaining travel documents from Honduras.  (Tr. 35).  He also testified that, had the BIA not granted a stay, Diaz-Ortega likely would have been removed in May 2018.  (Tr. 38).  And to her credit, Diaz-Ortega testified that she would cooperate in obtaining a travel document if the BIA denies her motion and lifts the stay, as she has cooperated before.  (Tr. 35-36, 64).[13]

Come what may, even in the most remote scenario, Diaz-Ortega's detention thus has an "obvious termination point," and is not "potentially permanent."  That detaches her claim from the scenario and concerns addressed by the Supreme Court in Zadvydas.  As stated previously, this conclusion requires no predicate finding of

---

[12] At the hearing, the Court asked the Government to list the points or events which may foreseeably end Diaz-Ortega's detention.  In addition to a BIA decision, the Government also suggested that Diaz-Ortega's detention may end if she withdrew her motion to reopen.  (Tr. 70).  While an honest and well-intended response to the Court's question, the Government's suggestion was not well-founded.  Even if it would prompt immediate release, such a withdrawal would also constitute a pressured forfeiture of a right to pursue legitimate relief before the BIA.  The suggestion thus warrants no further analysis.

[13] She has also repeatedly sought to expedite the BIA's ruling.  The Court lacks enough information to "deduce" whether Diaz-Ortega is likely to succeed before the BIA – if a court could ever reasonably arrive at such a deduction.

bad faith.[14]  It is unaffected by the parties' agreement that the BIA's delay in this case has been unusual (Tr. 51), or by Diaz-Ortega's showing that DHS/ICE may be responsible for some of the BIA's delay.[15]

Importantly, however, the decision would also not represent a "bright-line rule" foreclosing any <u>Zadvydas</u> petition where detention has been extended by the petitioner's litigation, or where removal has been delayed by the BIA's stay or delayed

---

[14] The Fifth Circuit has not explicitly denounced a "bad faith" requirement.  But in <u>Andrade</u>, the Fifth Circuit denied habeas relief without imposing any bad faith requirement.  And in <u>Balogun v. I.N.S.</u>, 9 F.3d 347, 351-51 (5th Cir. 1993), the Fifth Circuit articulated at least a general view when it held that a six-month deportation period could be tolled if the alien's conduct "hampered" or "delayed" removal.  Notably, the case involved obstructive acts.  But <u>Balogun</u> at least recognized that tolling could apply – and had been applied by other courts – when a detainee hampered removal only by "initiating litigation regarding the validity of the deportation order." <u>Id.</u> at 351.  The decision contained no demarcation line for bad faith or obstructive acts.  The Fifth Circuit merely found that tolling "*applies with greater force* when the conduct in question is *not* connected to [a] legitimate right of recourse to the judicial system, but rather is the deliberate obstruction of an otherwise imminent deportation." <u>Id.</u> (emphasis added).

The Court does not reach the issue of tolling here.  But <u>Andrade</u> and <u>Balogun</u> are generally instructive regarding the Fifth Circuit's view of bad faith in this context.

[15] DHS/ICE did not inform the BIA that Diaz-Ortega was in custody until it issued a "Notice to EOIR" on November 6, 2018.  (Doc. 20-8).  That was a period of nearly seven months. According to Officer Cox, the Notice helps the BIA prioritize decisions for detained aliens. (Tr. 41, 49-50).  To what extent or level of certainty was not clear.  And of course, it would be impossible to determine how much of the delay could be attributed to DHS/ICE, as opposed to the myriad of other factors at issue.  Officer Cox also testified that DHS/ICE may have sent another form to the BIA earlier.  But he was unable to produce corroborating evidence, even after checking during a recess of the hearing.  (Tr. 49, 59).

In all likelihood, DHS/ICE contributed to – or failed to prevent – some of the BIA's delay. This type of "fault" may be relevant to a detention period's overall reasonableness.  But at its core, <u>Zadvydas</u> obliges a court to decide whether removal is reasonably foreseeable, not which party can be assigned with more "blame" for a lengthy, but still temporary, delay in removal. <u>See, e.g.</u>, <u>Hussain v. Mukasey</u>, 510 F.3d 739, 743 (7th Cir. 2007) ("[E]ven if the delay was unconscionable, [and] was not procured in whole or part by Hussain himself . . . it would not do to order his release now, when the removal proceedings are in their final stage.").

ruling.[16]  And in keeping with <u>Zadvydas</u>, the decision does not sanction *any* period of detention regardless of its length or reasonableness.[17]

Instead, the Court finds that *this* Petitioner has not shown that she has been detained for a period of time, or in a manner, that is constitutionally impermissible. She has also not shown that there is no significant likelihood of her removal in the reasonably foreseeable future.  Therefore, she is not entitled to relief under <u>Zadvydas</u>.

**c.  <u>Diaz-Ortega is entitled to – and has been deprived of –
procedural rights under 8 C.F.R. § 241.4.</u>**

Although Diaz-Ortega is not entitled to the full measure of relief she seeks, she is, of course, entitled to any procedural rights incident to her detention status.  As noted previously, Diaz-Ortega's detention is governed in part by 8 C.F.R. § 241.4, an interpretive regulation that guides DHS/ICE in making periodic custody determinations.  <u>See</u> <u>id.</u> § 241.4(b)(1).  Section 241.4(k)(1) requires an initial, or 90-day custody review before the removal period expires.  Section 241(k)(2)(ii) requires a second, or 180-day review by the Headquarters Post-Order Detention Unit.  Other

---

[16] For instance, a petitioner may establish an overwhelming likelihood of success on an underlying challenge to detention or removal.  Or a petitioner may identify structural or procedural impediments to removal which were so intractable as to implicate <u>Zadvydas</u>.  <u>See</u> <u>Hernandez-Esquivel</u>, 2018 WL 3097029, at *6.

[17] The reasonable necessity of a detention period is always the touchstone of the detention analysis.  <u>See</u> <u>Zadvydas</u>, 533 U.S. at 699.  Here, Diaz-Ortega's detention has certainly been protracted.  But the Court cannot determine that the passage of time alone has been constitutionally impermissible.  Similar and longer periods have been upheld in other cases. <u>See, e.g.</u>, <u>Andrade</u>, 459 F.3d at 543 (denying habeas relief to a petitioner detained for more than three years); <u>Hernandez-Esquivel</u>, 2018 WL 3097029, at *6 (collecting cases in which courts upheld detention periods between 15 months and more than two years).

30

provisions of Section 241 list factors to be considered and procedures to be observed by DHS/ICE, as well as claims and presentments available to detained aliens.

But DHS/ICE seems to maintain that § 241.4 does not apply here.  Instead, Officer Cox testified that because the BIA stayed Diaz-Ortega's removal, she is not entitled to any custody review, and is effectively subject to mandatory detention.  (Tr. 52-53, 57).  DHS/ICE conducted an initial custody review – or something akin to it – within 90 days of Diaz-Ortega's detention.  (Tr. 52-53, 57).  This review – which Officer Cox testifies was "invalid" and unnecessary (Tr. 52-53, 57) – resulted in the Decision to Continue Detention (Doc. 20-5) issued by DHS/ICE on July 11, 2018. Since then, DHS/ICE has not conducted another custody review.  (Tr. 53).

In search of support for DHS/ICE's position, the Court reviewed any apparent sources of authority, including the BIA's stay order (Doc. 20-4), the Decision to Continue Detention (Doc. 20-5), and pertinent regulations such as 8 C.F.R. § 241.4 ("Continued detention of inadmissible, criminal, and other aliens beyond the removal period"), 8 C.F.R. § 241.6 ("Administrative stay of removal"), 8 C.F.R. § 241.13 ("Determination of whether there is a significant likelihood of removing a detained alien in the reasonably foreseeable future"), and 8 C.F.R. § 241.14 ("Continued detention of removable aliens on account of special circumstances").  None of these authorities supports or explains DHS/ICE's position.

The text of the regulation, however, is clear.  While 8 C.F.R. § 241.4(b)(1) does not specifically mention aliens whose removal orders have been stayed by the BIA, it does specifically mention aliens awaiting a decision on a motion to reopen, like Diaz-

Ortega.  Absent contrary authority or an exception for a stay of removal, Diaz-Ortega's detention is governed by 8 C.F.R. § 241.4.

Because § 214.4 has not been followed in all respects, some relief is warranted. On balance, the most appropriate relief is to require DHS/ICE to comply with § 241.4. While imperfect, this relief affords Diaz-Ortega appropriate access to procedural rights, but does so proportionately to the Government's interests when compared to the alternatives.[18]  It does not encroach upon DHS/ICE's discretion.  And it does not foreclose Diaz-Ortega's right to seek habeas relief in the future.

Therefore, Diaz-Ortega's Petition should be granted to the extent it seeks to secure access to the procedural rights contained in 8 C.F.R. § 241.4.[19]  DHS/ICE should be ordered to conduct a second custody review within a prescribed deadline, and to afford Diaz-Ortega access to any remaining provisions of § 214.4.

---

[18] Section 1231(a)(6) allows conditional release, but does not provide for periodic "bond hearings" under these circumstances.

Unconditional release would be disproportionate.  Section 241.4 only requires discretionary custody determinations, not unconditional release.  And those determinations likely fall outside the Court's review jurisdiction.  See 8 U.S.C. § 1252(a)(2)(B)(ii) ("[N]o court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in [their] discretion . . . .").

Some other form of conditional relief – for example, setting a deadline for a BIA decision, after which Diaz-Ortega could obtain a review, a hearing, or a writ of habeas corpus – would also be unwarranted, at least at present.  The Court has little context for the BIA's delay. Further, given the posture of the BIA proceedings, it would be difficult to justify release under the cited jurisprudence sanctioning even longer detentions, or to set an appropriate deadline. See Hussain, 510 F.3d at 743 ("By that time, the only appropriate relief would have been to condition his continued detention on a prompt resolution of the removal proceeding—and that relief was not sought.").

[19] Diaz-Ortega's requests for "release" and "any other relief" would certainly encompass this relief.

III.    __Conclusion__

Because the Government's Motion to Dismiss (Doc. 12) is procedurally improper, IT IS RECOMMENDED that the Motion be DENIED.

Because Diaz-Ortega cannot show there is no significant likelihood of her removal in the reasonably foreseeable future, IT IS RECOMMENDED that the Petition for Writ of Habeas Corpus (Doc. 1) be DENIED IN PART to the extent it seeks relief under __Zadvydas__.  IT IS FURTHER RECOMMENDED that the Petition for Writ of Habeas Corpus (Doc. 1) be accordingly DISMISSED IN PART WITHOUT PREJUDICE to her right to seek future habeas relief should her circumstances change in accordance with the findings herein.

Finally, because Diaz-Ortega is entitled to, but has been denied, full access to procedural rights contained in 8 C.F.R. § 241.4, IT IS RECOMMENDED that the Petition for Writ of Habeas Corpus (Doc. 1) be GRANTED IN PART to the extent it seeks to secure Diaz-Ortega's access to those procedural rights.  IT IS FURTHER RECOMMENDED that Respondents (and any other officials or entities bound by the provisions of 8 C.F.R. § 241.4) be ORDERED to: (1) conduct a second, or 180-day custody review of Diaz-Ortega's case within 14 DAYS of the Court's execution of a Judgment adopting this Report and Recommendation; and (2) afford Diaz-Ortega access to all other provisions of 8 C.F.R. § 241.4.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), any party may serve and file with the Clerk of Court written objections to this Report and Recommendation within fourteen (14) days after being served with a copy thereof,

unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections or reply briefs) may be filed, unless a party shows good cause and obtains leave of court. The District Judge will consider timely objections before issuing a final ruling.

A party's failure to file written objections to the proposed factual findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days after being served with a copy thereof, or within any extension of time granted by the Court under Fed.R.Civ.P. 6(b), shall bar that party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in Alexandria, Louisiana, on this __15th__ day of October 2019.

_____
JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE